FILED

AUG 2 6 2016 EW

08-26-16

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

RECEIVED
2016 AUG 26 PM 5: 11
CLERK
U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Ashland Avenue Investments, LLC,

                    Plaintiffs,

vs.                                                        Case No. 14 cv 07745

Marquette National Bank, As Trustee
Under a Trust Agreement dated December 2,
1998 and known as Trust Number 14662,                      Judge John Tharp, Jr.
May Toy, Gee Toy, Sau Kuen Lu Toy

                    Defendants,

## MOTION FOR RELIEF FROM FINAL JUDGMENT

The Defendant, May Toy, moves this court for relief from final judgment pursuant to both

Rule 59(b) and several sub-sections of Rule 60(b) detailed below. The reconsideration and relief

from final judgment based on new evidence as well as misrepresentations from Plaintiff's attorneys

that the judgment was based on. This evidence was not available at the time of summary judgment

because it was on computer equipment that was damaged by burst water pipes.

### I. GUARANTEE

Defendant have state in her previous declaration and have stated in a sworn affidavit attached as

(Exhibit A) that the signature on the guarantee is not hers and is a forgery.

### A) Defendant was Out of Town on the Date of the Guarantee

It would have been impossible for Defendant May Toy to have signed the guarantee in Cook

County, IL as she was out of town on business on December 15, 1998. In support of this, the

defendant produces her credit card statement showing purchases in the metro Des Moines, IA area

from December 14, 1998 to December 16, 1998. (Exhibit B) The notary stamp on the guarantee is

from the State of IL not the State of Iowa.

1

**B) Signature on Guarantee Does Not Match Defendant's Signatures**

Comparisons of the Defendant's signatures against the signature on the Guarantee using signature verification software show that it is not likely to be signed by the same person. The defendant closed on the purchase of 315 S. Ashland Chicago IL 60607 on Dec 18, 1998 and an unaltered copy of closing document with her signature is attached as (Exhibit C). The copy of the Guarantee submitted by the plaintiff is attached as (Exhibit D). Another reference signature for the defendant is from her passport and is attached as (Exhibit E).

Signature verification is a type of software that compares signatures and checks for authenticity. This saves time and energy and helps to prevent human error during the signature process and lowers chances of fraud in the process of authentication. The software generates a confidence score against the signature to be verified. Too low of a confidence score means the signature is most likely a forgery.

As defined by Techopedia, Signature verification is defined to be a technique used by banks, intelligence agencies and high-profile institutions to validate the identity of an individual. Signature verification is often used to compare signatures in bank offices and other branch capture. An image of a signature or a direct signature is fed into the signature verification software and compared to the signature image on file known to be valid. (Exhibit F)

Comparisons of the signature on the Guarantee against Defendant's signatures from the settlement/closing and passport using signature verification software show that there is a low probability or confidence (46% and 48%) that they are signatures from the same person, and a high likelihood that the signature is a forgery. (Exhibit G). When the closing signature was compared to the passport signature, the probability of the signatures being from the same person was 91%.

This comparison is based on mathematical and scientific calculations that objectively determine the similarity of the two signatures. Similarly, image comparison software also indicate that the signatures are different. (See Exhibits H)

**C) Evidence Was Not Available Before Due to Damage to Computer Equipment**

Consideration is warranted pursuant to Rule 59(b) and Rule 60(b)(2) because this evidence was not available previously because it was on computer equipment that was damaged by burst water pipes. The water pipes burst in the unit above because the receiver appointed in the state foreclosure case failed to pay for the gas and the water pipes froze. The equipment had to be sent out for repair and the evidence information was not accessible by the defendant. The defendant has sworn to this in her attached affidavit. This is a rare occurrence that was beyond the defendant's control.

Therefore, the defendant's contention that she did not sign the guarantee is supported by facts and objective data. It is a well known fact that there has been false notaries signatures and false loan documents in mortgage foreclosure documented by lawsuits by attorney generals of numerous states. Both Citibank and Wells Fargo, two of the holders of note in this case have been shown to have committed foreclosure fraud with false notarized documents. (See Exhibit I)

**II) NOT TRUE THAT THE DEFENDANT DID NOTHING**

The plaintiff alleged that the defendant did nothing when the call option letter was sent and the court agreed with the plaintiff. The Defendant had been trying for years to get the lender to correct her loan so that there would be an accurate accounting and status of her loan. If the defendant had done nothing, she would not have won the state foreclosure case.

The defendant had been disputing the amounts due throughout the entire state foreclosure

3

case including the timeframe of the call option period. The plaintiff knew that the defendant had been disputing the loan amounts and the burden is on the plaintiff to state the correct amount due when the call option was exercised. It is undisputed that the plaintiff was already on notice and clearly aware that the defendant was disputing the figures of the amount due calculated by the plaintiff. The amounts disputed included the principal amount due to alleged missing payments. (See Section B below and Exhibit L and Exhibit M)

## A) Marissa McGaughey testified to the Amounts Due as demanded by the Plaintiff

The defendant did not have to call the plaintiff to inquire what amount that the Plaintiff was demanding to pay off the loan because Plaintiff's counsel had called Marissa McGaughey to testified to the payoff amount during the trial in the state case trial. The Plaintiff knew that the Defendant had disputed this amount as well as Marissa McGaughey's testimony throughout the trial and state case. At trial, Defendant asked for and received a copy of Ms. McGaughey's calculations.(Exhibit J)

> THE COURT: To create what number?
>
> MR. WEININGER:The number that which she ( Ms. McGaughey) had testified to the calculation that she came up with that she can't remember the exact number. If I can show this to Ms. Toy. this
>
> MS. TOY: Can I get a copy?
>
> MR. WEININGER: I could certainly get you a copy. This is not something I'm going to introduce as evidence. It is just –
>
> THE COURT: If you show it to a witness, it is something that you should tender; particularly based on your standards.
>
> (Record of Proceedings, *Wells Fargo v. May Toy, et al*, 09CH1149, January 29, 2013 12:45pm page 201 L15 – page 202 L5)

The Defendant Toy raised objections and were sustained by the State Court. Specifically...

4

MS. TOY: Your Honor, I move to strike this witness(Marissa McGaughey)'s testimony due to the fact for the summary –motion for summary judgment that was filed by plaintiff's attorney I raised the objection at the time that Hudson Advisors were not included as a party to this. Hudson Advisors were never included in any of the filings. There was no record that specified that Hudson is the servicer and even though we moved to the evidentary hearing, plaintiff did not provide any records from Wells Fargo that specifies that there was an agreement saying that Hudson Advisors has attorney in fact, power of attorney for Wells Fargo for this loan.

… Key Bank also; there has been no documentation provided that Key Bank is a servicer of this loan prior the the original motion for summary judgment. There has been no foundation to lay that this witness has standing to testify to these records at this point and Hudson Advisors, you know is not name as part of this loan.

…Likewise Key Bank-- The witness (Marissa McGaughey) testified that Key Bank is the servicer for this loan. The witness is not an employee of Key Bank. I've never heard of Key Bank prior to these records being introduced into evidence. And it is I think, you know, that the plaintiff's attorney needs to show that the witness is actually qualified, …

THE COURT: I think I understand your objection. I have a question for the plaintiff's counsel. Well, I have a question for the witness. These last two pages to Exhibit 5, the loan history that you referred to, whose records are these?

THE WITNESS: I'm not sure I understand your question, but these are maintained by Key Bank as part of the servicing contract.

The COURT: Okay, so...And the employees of Key Bank would input this information that is on this two page record?

The WITNESS: Yes, sir.

THE COURT: You are not-- And you are not involved in the preparation of this document?

THE WITNESS: Not of Key Bank. It is--

(Record of Proceedings : Page 208 L14 – Page 211 L19)

…

THE COURT: I understand. The court finds that there has not been a foundation laid for the admission of these two records by this witness and so these two pages will not be admitted. And to the extend that this witness' testimony is dependent upon information that is on this loan history that is prepared by another company, that testimony would also be stricken.

(Record of Proceedings : Page 213 L 23 – Page 214 L 8)

….

THE COURT: No, I'm not striking (all) her testimony; but I'm not admitting the exhibit and I'm striking whatever testimony that she has given with regard to – specifically with regard to $55,000 being paid in taxes and $7300 being paid in insurance all of which came from this particular document which is not in evidence. I think that those are the things that she testified to that came from this record. So those -- so those will be stricken.

(Record of Proceedings : Page 215 L 19 – Page 216 L 3)

(See Exhibit N for true copies of the pages from the Record of Proceedings for State Case)

If the defendant had done nothing as the Plaintiff had alleged, she would not have prevailed in the State case. The facts clearly show that the Defendant disputed the amounts due as testified to by Ms. McGaughey per Exhibit J. Ms. McGaughey had signed and sent the call letter a few days prior to her testimony. Plaintiff failed to correct or even attempted to correct the payoff amount or provide documentation justifying the amounts within the call option period or later thereby hindering performance. The plaintiff did nothing after the state court sustained Toy's objections.

6

The burden was on the plaintiff to calculate and state the accurate payoff amount given that the defendant had dispute plaintiff's calculations both prior to and after the call notice. In fact, the defendant had continuously been disputing the loan amounts which was a known fact to the plaintiff.

In the *First Merit Bank, N.A. v. Little*, No. 13CV03672 (N.D. Ill., March 30, 2015) case, this court ruled that based on the doctrine of prevention the defendant's performance was excused due to plaintiff's hindrance or failure to cooperate with her.   For this case, it is very similar, the plaintiff and defendant both differed in the amount of the loan due. The plaintiff failed to cooperate with the defendant by failing to provide her with loan transactions or records that she could audit. And although the defendant had repeatedly provided proof of insurance to the Plaintiff and including Plaintiff's attorneys, the Plaintiff continued to charge forced placed insurance as evidenced in Ms. McGaughey's calculations in (Exhibit J) and her testimony. The largest dispute was whether the loan was in default. Despite these and other disputes raised by the Defendant Toy, Plaintiff never corrected any of these problems but continued to maintain/argue that the amounts due per Marisa McGaughey's testimony were correct.

## B) DISPUTED AMOUNT INCLUDED PRINCIPAL

Plaintiff had argued that Call Option was independent of State Action. However that is not the case. The purpose of the state evidentiary hearing was to "determine what was owe" inclusive of the principal amount. Defendant claimed that there were not only escrow issues but missing payments which affected the principal amount of the loan.   In the state case, the plaintiff's own witness's Karma Flowers explained in court how to read the transaction date. When a payment is made in a branch, the effective date (last column of the history) is the date that it was received in the branch. The payment receipt in (exhibit K) shows a transaction date of Oct 31, 2008 but the loan transaction

7

history (Exhibit L) attached to the plaintiff's affidavits do not show a payment with an October 31, 2008 effective date. See (Exhibit M) for the relevant section of Karma Flower's testimony. This payment was never credited back to the defendant and is still owed to the defendant. The state court did not consider it because the evidence could not be found in time for the state hearing.

### C) Plaintiff had the burden to state a correct payoff amount in the letter.

At the time the Plaintiff issued the call option letter, they knew that the defendant Toy was disputing the amounts due as determined by the Plaintiff, i.e. default of loan, escrow problems, missing payments, forced placed insurance,etc. It was clear throughout the trial and prior that the defendant disputed the amount but the Plaintiff did not correct any of it's calculations during the payoff period ending on April 24, 2013. Instead Plaintiff maintained/argued that their calculations were correct. Plaintiff was the one who failed to act and instead waited for the State Court to make it's ruling. At the final hearing, on or about July 2014, the defendant prevailed. If the defendant had done nothing as the Plaintiff had alleged, she could not and would not have prevailed.

The burden was on the plaintiff to state the correct amounts due with proof when they issued the call option letter and especially after the defendant disputed them as Plaintiff had access to all the records. In such circumstances, the plaintiff is not entitle to enforcement of the call option when they clearly failed to state the correct amount due. The fact that the defendant won the state foreclosure suit clearly shows that the defendant was rigorously disputing Plaintiff's amount.

Plaintiff argued that Plaintiff did not hinder Borrower's performance because Defendant did not call the plaintiff and ask for a payoff amount. However, Defendant did not have to ask for the payoff amount by calling the Plaintiff because Marissa McGaughey had testified (a few days after sending the call letter) to the amount due which was based on the loan being in default, tax and

insurance payments. This amount was clearly disputed by the defendant.

To cure the call option by April 24, 2013, the defendant would have to paid the amount demanded by the Plaintiff including the default interest amounts and disputed tax and insurance payments which is clearly unfair and unjust when the defendant was not in default and had been disputing it all along. It is also important to note that the state court had sustained Toy's objections disputing the amounts. The plaintiff was demanding an amount that they were not entitled to. In such circumstances, the burden is on the plaintiff to state an accurate amount due. The relevant point is that Plaintiff could not and/or would not calculate an accurate amount due when they call the note and demanded payment and the Plaintiff was already on notice that the defendant had requested an accurate loan amount/status numerous times.

It is also important to note that it was solely Plaintiff's own mistakes that cause the problems and incalculability of the loan thereby hindering performance. The fact that the Plaintiff refused/failed to correct the problems on their own did hinder the defendant's performance and ability to pay off the loan. Additionally, calling the loan when in the middle of the wrongful state foreclosure case which the plaintiff eventually lost hindered defendant's ability to refinance the loan. Similar to *Little*, this court should reconsider and find that the doctrine of prevention does apply. The record in the state case shows clearly, that the defendant did dispute the amounts calculated by Marisa McGaughey. It was the Plaintiff who failed to act after the state court ruled against them.

### III) RULE 60(b)(3) – FRAUD and MISREPRESENTATION

Rule 60(b)(3) provides for relief from final judgment for "fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party." The Plaintiff's attorneys alleged in their motions and filings that the defendant did nothing and never asked for a calculation

of the amount due or disputed the amount. The court based it's summary judgment ruling for the plaintiff based on the representation from plaintiff's attorneys that the defendant Toy did nothing and never asked or an amount due or disputed the amount. (Exhibit M – page 1 ) is the cover page of the record of proceedings which show that both Ms. Rebecca Weininger (formerly Ms. Rebecca Reyes ) and Mr. Noah Weininger was present at the state evidentary hearing representing the plaintiff when the Defendant Toy asked for and received the calculation done by Marissa McGaughey. Both attorneys were also present when the state court sustained the Defendant's objections. See (Exhibit N ) for the relevant pages from the record/transcript of the hearing.

This is a clear misrepresentation of the facts to the court by plaintiff's attorneys which warrants relief under rule 60(b)(3). "Because attorneys are officers of the court, dishonest conduct on their part "would constitute fraud on the court." *H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1119 (6th Cir.1976). "While an attorney "should represent his client with singular loyalty that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court." *Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072, 1078 (2d Cir. 1972). quoting from 7 Moore, Federal Practice ¶ 60.33 at 513 (1971 ed.). This was a material misrepresentation which affected the court's judgment as the court's ruling was based on the premise that the defendant did nothing and relief is warranted.

## IV) RULE 60(b)(6)

Even if this court find that plaintiff and their attorney's actions did not violated rule 60(b)(3), relief is warranted pursuant to Rule 60(b)(6) on the terms relief is warranted to prevent an unjust result based

on all the facts and evidence to date and a misunderstanding/miscomprehension of the facts of the case since much of occurrences in the state case are relevant. *Merit Insurance Co. v. Leatherby Insurance Co.*, 714 F.2d 673, 682-83 (7th Cir.1983),469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984) *cert. denied, .* Based on the new evidence and state case record of proceedings, a new proceeding would produce a different outcome.

## V) ERIE DOCTRINE

The Court has ruled that the Defendant Toy as beneficiary of the trust cannot defend or bring certain arguments/defenses against the foreclosure suit but in the State Courts, the Courts ruled that Toy did have standing to defend against the foreclosure as a pro-se litigant under the Illinois Mortgage Foreclosure Law. Toy was able to not only defend but prevail in the State foreclosure case.

Based on the Erie doctrine, *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts when confronted with the issue of whether to apply federal or state law in a lawsuit, must apply state law on issues of substantive law. In this case, state law and precedence set in the state foreclosure case for this same loan provide that Toy should be able to defend against the foreclosure fully.

When this case was before Judge Bucklo, the Court asked Plaintiff's attorney why this case was in Federal court instead of State Court and Plaintiff's counsel did not respond. The defendant believes that in part that Plaintiff similar to *Erie*, sought to avoid state laws/precedence that were not favorable.

The ability of the Defendant Toy to defend against the foreclosure should be based on the merits of the foreclosure case and not her ability/inability to afford an attorney to represent the trust. Plaintiff knew that Defendant became a pro-se litigant because of the expense of legal fees.

Plaintiff's actions already harmed the defendant by dragging her through a five year foreclosure case which they lost. The practice of the banks is to drag out the foreclosure cases to the point that defendants can no longer afford legal representation. Justice is not served by not allowing the Defendant to defend against the foreclosure. Based on the Erie doctrine, the defendant believes that she is entitled to defend against the foreclosure. Similarly in the state court, the state court ruled that the guarantee must be proven at trial/evidentary hearing given that the Defendant denied in an affidavit/declaration that she did not sign the guarantee and not on motions or affidavits for summary judgment.

## CONCLUSION

The new evidence with respect to the fact the Defendant was out of state during the alleged signing of the Guarantee as well as the fact that the signatures do not match based on signature verification software that is used to detect forged signatures are of material fact. Likewise, it is clear that Defendant did not fail to act or request any information. As stated previously in her Opposition to Plaintiff's Motion for Summary Judgment, defendant had been disputing the Plaintiff's calculations all along. The defendant did ask and received Ms. McGaughey's calculations and defendant did dispute them similar to *Little*. The court's summary judgment was based on misrepresentations from Plaintiff's attorneys and is against the weight of the facts. There are clearly material issues. Therefore, the defendant prays that the Court will grant defendant's motion for relief from final judgment and grant reconsideration / trial and any other relief this court deems fair and just.

Respectfully submitted,

May Toy

May Toy, Pro Se
315 S. Ashland Ave.
Chicago, IL 60607

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

Ashland Ave Investments, LLC,

                                   Plaintiffs,

vs.                                                          Case No. 14 cv 07745

Marquette National Bank, As Trustee
Under a Trust Agreement dated December 2,
1998 and known as Trust Number 14662,
May Toy, Gee Toy, Sau Kuen Lu Toy

                                   Defendants,

## AFFIDAVIT OF MAY TOY IN SUPPORT OF
## MOTION FOR RELIEF FROM FINAL JUDGMENT

I, May Toy, being first duly sworn, on oath, states and affirms the following facts:

1.  I'm competent to be a witness to the matters stated in this Affidavit and could and would testify to those matters in a court of law, under oath, subject to the penalty of perjury.

2.  I have personal knowledge of the facts, statements, and circumstances set forth below and in the defendant's MOTION FOR RELIEF FROM FINAL JUDGMENT and verify that they are the truth as I know them and would testify to the same under oath.

3.  I was out of state from December 14, 1998 to December 16, 1998, specifically I was in the metro Des Moines, IA area for business.

4.  I did not sign the Guarantee and believe that signature is a forgery as I was not in the State of IL on December 15, 1998 and could not have signed the Guarantee.

5.  Attached as Exhibit B is my credit card statement without alteration that shows purchases in the Des Moines, IA location from December 14, 1998 to December 16, 1998.

6.  Attached as Exhibit N is a true copy of the relevant pages of the Record of Proceedings from the State Case where I asked for a copy of the amounts due and where I also disputed the amounts.

7.  The credit card statement, signature comparisons, and the Record of Proceedings from the State Case and many of the files pertaining to this case and the state case were not available at the time of my briefs for the summary judgment because it was on computer equipment which was damaged when the water pipes burst at 315 S. Ashland and it had to be send it out to be repaired.   This was unforeseen and beyond my control.

# EXHIBIT A

8. I could not afford to get a second copy of the record of proceedings in time for the summary judgment briefs.

FURTHER AFFIANT SAYETH NAUGHT.

By: _____
                                                                      May Toy

STATE OF ILLINOIS , COUNTY OF COOK
Subscribed and sworn to before
me this ___24th___ day of August, 2016

_____
NOTARY PUBLIC

# EXHIBIT A

## Cardmember Statement

# FIRST USA.

Free & Convenient ON-LINE ACCESS to your Account. View your statement on line, make payments, new daily transactions and account balance. Register today at www.FirstUSA.com.



| ACCOUNT NUMBER | PAST DUE AMOUNT | NEW BALANCE | MINIMUM PAYMENT DUE | PAYMENT DUE DATE | WRITE AMOUNT OF PAYMENT |
|---|---|---|---|---|---|
| ▓▓▓▓▓▓ | 0.00 | 721.92 | 14.00 | 01/13/99 | |

**Please make checks payable to First USA Bank, N.A. First USA Bank, N.A. is the issuer of this account.**
**Send top portion of statement with payment in enclosed envelope.**

29

288768

FIRST USA BANK,   NA
P.O. BOX 50882
HENDERSON NV  89016-0882

MAY TOY
117 W HARRISON ST
APT T----265
CHICAGO IL  60605-1709

44171225301148010000386000076680822

| ACCOUNT NUMBER | TOTAL CREDIT LINE | CASH ADVANCE CREDIT LINE | AVAILABLE CREDIT | AVAILABLE PORTION FOR CASH ADVANCES | PAYMENT DUE DATE | CLOSING DATE |
|---|---|---|---|---|---|---|
| ▓▓▓▓▓▓ | 18,000 | 9,000 | 17,278 | 9,000 | 01/13/99 | 12/19/98 |

### CARDMEMBER ACTIVITITY SUMMARY

| TRANS. DATE | POST. DATE | REFERENCE NUMBER | MERCHANT NAME OR TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|---|---|
| 11-20 | 11/20 | 24717051NLACGS8GS | MENARDS 3092 CHICAGO IL | 36.98 |
| 11-22 | 11/22 | 24717051NLPABC9AW | CARSONS RIBS CHICAGO IL | 24.14 |
| 12/01 | 12/01 | 2416407DAB2S768GT | AMOCO 02459857 CHICAGO IL | 20.00 |
| 12/01 | 12/01 | 2416407DAB8SDF99B | PETSMART INC.0423 BURBANK IL | 40.16 |
| 12/10 | 12/10 | 2471705DPG5KGK7WG | MENARDS 3092 CHICAGO IL | 15.71 |
| 12/11 | 12/11 | 7441712122F28Y388 | PAYMENT – THANK YOU | 1052.87 CR |
| 12/14 | 12/14 | 2447205228864R27TO | DRAGON HOUSE WEST URBANDALE IA | 23.75 |
| 12/15 | 12/15 | 2447205229976SN08GP | DRAGON HOUSE WEST URBANDALE IA | 23.75 |
| 12/16 | 12/16 | 2439900DAL2V8XLAB | OFFICE MAX  0000307 W DES MOINES IA | 86.99 |
| 12/16 | 12/16 | 2461043212L9EGS8G | TUESDAY MORNING #334 URBANDALE IA | 122.98 |
| 12/18 | 12/18 | 24492802B3X0GY9G | SEVEN TREASURES CHICAGO IL | 13.88 |
| 12/19 | 12/19 | 2471705DAL5ACA7WE | MENARDS 3092 CHICAGO IL | 313.58 |

| PREVIOUS BALANCE | - PURCHASES, FEES AND ADJUSTMENTS | - CASH ADVANCES | + FINANCE CHARGES | - PAYMENTS AND CREDITS | NEW BALANCE |
|---|---|---|---|---|---|
| 1,052.87 | 721.92 | 0.00 | 0.00 | 1,052.87 | 721.92 |

# EXHIBIT B

# Settlement Statement

U.S. Department of Housing
and Urban Development

## Greater Illinois Title Company



OMB No. 2502-0265

| B. Type of Loan | | | | 6. File Number. | 7. Loan Number. | 8. Mortgage Insurance Case Number. |
|---|---|---|---|---|---|---|
| 1. ☐ FHA | 2. ☐ FmHA | 3. ☒ Conv. Unins. | | 4233972 | 010095163 | N/A |
| 4. ☐ VA | 5. ☐ Conv. Ins | | | | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown.
Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name and Address of Borrower | E. Name and Address of Seller | F. Name and Address of Lender |
|---|---|---|
| MAY TOY | RITA O. PUCCI | CITIBANK, FEDERAL SAVINGS BANK |
| 117 WEST HARRISON # 7285 | 315 SOUTH ASHLAND | 500 WEST MADISON |
| CHICAGO, ILLINOIS 80605 | CHICAGO, ILLINOIS 60602 | CHICAGO, ILLINOIS |
| | | 60661 |

| G. Property Location | H. Settlement Agent | |
|---|---|---|
| 315 SOUTH ASHLAND | GREATER ILLINOIS TITLE COMPANY | |
| CHIAGO, ILLINOIS | | |
| 905 | Place of Settlement | I. Settlement Date |
| 17-17-114-005-0000 | 120 NORTH LASALLE STREET | 12/18/98 |
| 17-17-114-045 / 17-17-114-044 | SUITE 800 | |
| | CHICAGO, ILLINOIS 60602 | |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due From Borrower** | | **400. Gross Amount Due From Seller** | |
| 101. Contract sales price | 966,500.00 | 401. Contract sales price | 966,500.00 |
| 102. Personal property | | 402. Personal property | |
| 103. Settlement charges to borrower (line 1400) | 35,020.22 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by the seller in advance | |
| 106. City/town taxes to | | 406. City/town taxes to | |
| 107. County taxes to | | 407. County taxes to | |
| 108. Assessments to | | 408. Assessments to | |
| 109. | | 409. | |
| 110. | | 410. | |
| 111. | | 411. | |
| 112. | | 412. | |
| **120. Gross Amount Due From Borrower** | 1,001,520.22 | **420. Gross Amount Due To Seller** | 966,500.00 |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due To Seller** | |
| 201. Deposit or earnest money | 97,500.00 | 501. Excess deposit (see instructions) | |
| 202. Principal amount of new loan(s) | 773,000.00 | 502. Settlement charges to seller (line 1400) | 5,386.51 |
| 203. Existing loan(s) taken subject to | | 503. Existing loan(s) taken subject to | |
| 204. | | 504. Payoff of first mortgage loan to: CHASE MAN | 411,143.71 |
| 205. | | 505. Payoff of second mortgage loan to: US BANK | 98,421.50 |
| 206. | | 506. EARNEST MONEY HELD BY BROKER | 97,500.00 |
| 207. | | 507. | |
| 208. | | 508. | |
| 209. SECURITY DEPOSIT RENT | 7,206.06 | 509. SECURITY DEPOSIT RENT | 7,206.05 |
| Adjustments for items unpaid by the seller | | Adjustments for items unpaid by the seller | |
| 210. City/town taxes to | | 510. City/town taxes to | |
| 211. County taxes 1/1/98 to 12/18/98 | 10,028.31 | 511. County taxes 1/1/98 to 12/18/98 | 10,028.31 |
| 212. Assessments to | | 512. Assessments to | |
| 213. | | 513. | |
| 214. | | 514. | |
| 215. | | 515. | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | 887,734.36 | **520. Total Reduction Amount Due Seller** | 627,668.08 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross amount due from borrower (line 120) | 1,001,520.22 | 601. Gross amount due to seller (line 420) | 966,500.00 |
| 302. Less amounts paid by/for borrower (line 220) | (887,734.36) | 602. Less reductions in amt. due seller (line 520) | (627,668.08) |
| 303. Cash ☒ From ☐ To Borrower | 113,785.86 | 603. Cash ☐ From ☒ To Seller | 338,831.92 |

## SUBSTITUTE FORM 1099 SELLER STATEMENT

The information contained in blocks E, F, G, H, and I and on line 401 (or, if line 401 and 404)
is important tax information and is being furnished to the Internal Revenue Service. If you are required to file a return,
a negligence penalty or other sanction will be imposed on you if this item is required to be reported and the IRS
determines that it has not been reported.

00155

# EXHIBIT C

| L. | Settlement Charges | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. | Total Sales/Broker's Commission based on price | | | |
| | Division of Commission (line 700) as follows: | | | |
| 701. | $48,326.00 to | BELIARD, GORDON & PARTNERS | | |
| 702. | to | | | |
| 703. | Commission paid at Settlement | | | |
| 704. | EARNEST MONEY $97,500.00 POC (B) HELD BY BELIARD, GORDON & PARTNERS | | | |
| 800. | Items Payable in Connection With Loan | | | |
| 801. | Loan Origination Fee | 5 % to CITIBANK, FEDERAL SAVINGS BANK | 3,865.00 | |
| 802. | Loan Discount | | | |
| 803. | Appraisal Fee to | | | |
| 804. | Credit Report to | | | |
| 805. | Lender's Inspection Fee to | | | |
| 806. | Mortgage Insurance Application Fee to | | | |
| 807. | Assumption Fee to | | | |
| 808. | SERVICE CHARGE TO CITIBANK, FEDERAL SAVINGS BANK $3,865.00 POC BY (B) | | | |
| 809. | FLOOD CERTIFICATION FEE TO | CITIBANK, FEDERAL SAVINGS BANK | 14.00 | |
| 810. | DOCUMENT PREPARATION / TAX SERVICE FEE CITIBANK, FEDERAL SAVINGS BANK | | 264.00 | |
| 811. | HOLD BACK TO CITIBANK | | 8,500.00 | |
| 900. | Items Required By Lender To Be Paid in Advance | | | |
| 901. | Interest from 12/18/98 to 1/1/99 @ 158.36 /day for 14 day | | 2,217.04 | |
| 902. | Mortgage Insurance Premium for months to | | | |
| 903. | Hazard Insurance Premium for years to | | | |
| 904. | Flood Insurance Premium for years to | | | |
| 905. | | | | |
| 1000. | Reserves Deposited With Lender | | | |
| 1001. | Hazard insurance months @ per month | | | |
| 1002. | Mortgage insurance months @ per month | | | |
| 1003. | City property taxes months @ per month | | | |
| 1004. | County property taxes months @ per month | | | |
| 1005. | Annual Assessments months @ per month | | | |
| 1006. | Flood Insurance months @ per month | | | |
| 1007. | BEGINNING ESCROW months @ per month | | 11,832.68 | |
| 1008. | months @ per month | | | |
| 1009. | months @ per month | | | |
| 1100. | Title Charges | | | |
| 1101. | Settlement or closing fee to | GREATER ILLINOIS TITLE COMPANY | 666.25 | 466.25 |
| 1102. | Abstract or title search to | | | |
| 1103. | Title examination to | | | |
| 1104. | Title insurance binder to | | | |
| 1105. | Document preparation to | | | |
| 1106. | Notary fees to | | | |
| 1107. | Attorney's fees to | MARY DEROIN | | 1,200.00 |
| | (includes above item numbers | ) | | |
| 1108. | Title Insurance to | GREATER ILLINOIS TITLE COMPANY | 185.00 | 1,000.00 |
| | (includes above item numbers 1103 & 1108) | | | |
| 1109. | Lender's coverage $ | 185.00 for $773,000.00 | | |
| 1110. | Owner's coverage $ | 1,391.00 for $975,000.00 | | |
| 1111. | COMMITMENT UPDATE FEE TO GREATER ILLINOIS TITLE COMPANY | | 20.00 | |
| 1112. | LOCATION NOTE TO GREATER ILLINOIS TITLE COMPANY | | 70.00 | |
| 1113. | | | | |
| 1200. | Government Recording and Transfer Charges | | | |
| 1201. | Recording fees: Deed $ 25.50 ; Mortgage $ 43.50 ; Releases $ 59.00 | | 69.00 | 59.00 |
| 1202. | City/county/stamps: Deed $ 7,800.00 ; Mortgage $ | | 7,248.75 | 483.25 |
| 1203. | State tax/stamps: Deed $ 975.00 ; Mortgage $ | | | 966.50 |
| 1204. | RECORDING ASSIGNMENT OF RENTS TO RECORDER OF DEEDS | | 43.50 | |
| 1205. | FILING UCC'S STATEMENTS TO GREATER ILLINOIS TITLE | | 25.00 | |
| 1300. | Additional Settlement Charges | | | |
| 1301. | Survey to GREATER ILLINOIS SURVEY COMPANY | | | 1,050.00 |
| 1302. | Pest Inspection to | | | |
| 1303. | REIMBURSEMENT FEES TO MARTY DEROIN | | | 112.51 |
| 1304. | COURIER FEE TO GREATER ILLINOIS TITLE COMPANY | | | 31.00 |
| 1305. | | | | |
| 1400. | Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | $35,020.22 | $5,368.51 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of HUD-1 Settlement Statement.

_Mary Toy_             _Rita C. Pucci_

MAY TOY                    RITA C. PUCCI

To the best of my knowledge, the HUD-1 Settlement Statement which I have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction.

SETTLEMENT AGENT _____     DATE 12/18/98

WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form. Penalties upon conviction can include a fine or imprisonment. For details see: Title 18 U.S. Code Section 1001 and Section 1010

# EXHIBIT C

IN WITNESS WHEREOF, this obligation is executed, sealed and delivered this 15th day of December , 19 98 .

May Toy

STATE OF Illinois )
                          ) S.S.
COUNTY OF Cook )

I, _____ , a notary public in and for said County, in the State aforesaid, do hereby certify, that
May Toy

personally known to me to be the same persons whose names are subscribed to the foregoing instrument, appeared before me this day in person and acknowledge that they signed and delivered the said instrument as their own free and voluntary act, for the uses and purposes therein set forth.

GIVEN under my hand and notarial seal, this 15th day of December , 19 98 .

My Commission Expires  3/19/ 2001                              _____
                                                                                          Notary Public

"OFFICIAL SEAL"
Megan R. Van Vliesbergen
Notary Public, State of Illinois
My Commission Exp. 03/19/2001

# EXHIBIT D



EXHIBIT E

# Signature Verification

## Connect with us





### Definition - What does *Signature Verification* mean?

Signature verification is a technique used by banks, intelligence agencies and high-profile institutions to validate the identity of an individual. Signature verification is often used to compare signatures in bank offices and other branch capture. An image of a signature or a direct signature is fed into the signature verification software and compared to the signature image on file.

## Email Newsletter

Join thousands of others with our weekly newsletter

Enter your email address...

Subscribe Now



### Techopedia explains *Signature Verification*

Signature verification is a type of software that compares signatures and checks for authenticity. This saves time and energy and helps to prevent human error during the signature process and lowers chances of fraud in the process of authentication. The software generates a confidence score against the signature to be verified. Too low of a confidence score means the signature is most likely a forgery.

Signature verification software has now become lightweight, fast, flexible and more reliable with multiple options for storage, multiple signatures against one ID and a huge database. It can automatically search for a signature within an image or file.



cloudistics

Ignite

# EXHIBIT F



## Comparison Closing Document's Signature against Guarantee Signature - FAKE

Closing Signature

Guarantee Signature

## Comparison Passport Signature against Guarantee Signature - FAKE

Passport Signature

Guarantee Signature

# EXHIBIT G

## Comparison Closing Document's Signature against Passport Signature - GENUINE



Closing Signature                    Passport Signature

EXHIBIT G

Comparison of Signatures (Closing to Guarantee) using image comparison software show
the First, Last and Full to be Different.

 



EXHIBIT H

Comparison of Signatures using image comparison software show signatures from the closing and the guarantee to be different.



 **InvestorCenter**

# Robo-Signing: Documents Show Citi and Wells Also Committed Foreclosure Fraud

**Abigail Field**

Oct 2nd 2010 10:00AM
Updated Oct 4th 2010 7:39AM



Joe Raedle/Getty Images

Documents submitted to a court are supposed to be true as submitted. As an attorney, if I file with a court a document in which I swore that I personally verified the information contained within the document is true, but I didn't actually do that, I'd get in real trouble. It's simple: That's fraud in the eyes of the court.

GMAC, JPMorgan Chase (JPM), Bank of America (BAC) and One West Bank employees routinely sign hundreds of documents without verifying what they're signing. Those documents are then submitted to courts as if the documents were true, to enable the banks to foreclose on delinquent properties. Wells Fargo (WFC) and Citigroup's (C) CitiMortgage told *The New York Times* their employees do not engage in similar practices. Yet, new evidence I've found shows they have. At deadline, I was still awaiting a response from CitMortgage.

## Confusion at Wells Fargo

For example, in one case I reviewed, Herman John Kennerty of Wells Fargo gave a deposition describing the department he oversees for Wells Fargo. It's a department dedicated to simply signing documents. Kennerty testified that he signs 50 to 150 documents a day, verifying only the date on each. Although the foreclosure in that case was upheld, Wells Fargo did not dispute

Kennerty's signing practices.

What else might Kennerty want to verify? Well, in one document he signed that I've reviewed, he supposedly transferred the mortgage from Washington Mutual Bank FA to Wells Fargo on July 12, 2010. But that's impossible because Washington Mutual Bank FA changed its name in 2004, and by any name WaMu ceased to exist in 2008, when the Federal Deposit Insurance Corp. took it over. Making the document even less comprehensible, the debtor had declared bankruptcy a month earlier, according to consumer bankruptcy attorney Linda Tirelli, who represents the debtor. Why would Wells Fargo want a mortgage from someone in bankruptcy?

Finally, Tirelli points out that the papers Wells Fargo filed included a different transfer of the mortgage dated three days before the debtor took out the loan. The documents are a mess, yet Kennerty signed them regardless. Wells Fargo flatly stands behind its practices:

> *"Wells Fargo policies, procedures and practices satisfy us that the affidavits we sign are accurate. We audit, monitor and review our affidavits under controlled standards on a daily basis. We will stand by our affidavits and, if we find an error, we will take the appropriate corrective action. As a standard business practice we continually review, reinforce and strengthen our policies and procedures."*

Wells offered no explanation of the document Kennerty signed in Tirelli's case.

## Legal Nonsense at CitiMortgage

In a similar example, one M. Matthews signed a number of documents that CitiMortgage has used to try to foreclose on properties. While Matthews may or may not sign hundreds of documents a day -- I have not found a deposition in which he swears that he does -- he certainly does not seem to verify the contents of the documents he's signing.

For example, he signed a document supposedly transferring a mortgage from Lehman Brothers to Citi in 2009. It's hard to see how that's possible because Lehman had already ceased to exist. When confronted with its nonsensical filing, Citigroup decided not to foreclose. Instead, it gave the homeowner a meaningful mortgage modification -- $15,000 principal reduction, plus a 30-year fixed mortgage at 3%. Tirelli, who represented the debtor in this case, too, notes that she sees bad documents in the vast majority of cases, and she keeps files of "robo-signed" documents.

# EXHIBIT I

I want to note that in both the WaMu and Lehman Brothers documents, the signers were officially representing an entity called MERS, which was acting as the "nominee" of WaMu and the "nominee" of Lehman Brothers. But that doesn't change the problems with the documents as filed. MERS can't continue to be the nominee of an entity that doesn't exist. Moreover, MERS can't assign something it doesn't have, and MERS itself doesn't own the underlying note or mortgage.

Wells Fargo and CitiMortgage aren't the only big banks to apparently misrepresent their practices in the media. JPMorgan Chase told *The New York Times* that it had not withdrawn any documents in a pending case. However, Chase has in fact withdrawn robo-signed documents in a case Tirelli is currently defending. Chase now faces possible sanctions in the case.

### Cutting Corners

Why are the big, sophisticated banks submitting such problematic documents to the courts? The key reason is that sometimes when a bank wants to foreclose, it has to prove it actually has the right to foreclose -- that it owns the note and accompanying mortgage. Unfortunately for the banks, the securitization of mortgages and the changes in property-ownership documentation that accompanied such deals can make it hard for the banks to establish clean chains of title and produce original documents. That's especially difficult in an environment where a massive number of foreclosures must be started and completed in a timely manner.

Bankruptcy attorney O. Max Gardner explains that the time pressures to get these foreclosures done is overwhelming. One major foreclosure company, Lender Processing Services, actually rates attorneys on how quickly they complete each part of the foreclosure process for its mortgage-servicer clients, giving lawyers green, yellow or red labels to reflect their "Attorney Performance Rate." If an attorney fails to keep pace and lands in the red long enough, that attorney won't get any more business from LPS, or rather, from the banks LPS works for. Gardner calls it "stopwatch justice."

So rather than take the time to generate the correct documentation, it seems the banks cut corners. Yet these are not small nicks off the end of the corners, despite protests from the banks that the documents are essentially true, just signed badly.

Documents like those cited in this article -- which are common -- falsify the chain of title for the underlying properties. Clean title is so crucial for real estate deals that they won't close if a seller can't give good title. In fact, one major title insurer, Old Republic

National Title Insurance, will no longer insure titles for GMAC foreclosures because of the document problem. The stock market is weighing in, too, as shares of title insurers have taken a hit.

The chain-of-title problems has other practical consequences. Banks sometimes don't know which properties they can foreclose on. For example, banks have foreclosed on homes bought with cash. Two banks have tried to foreclose on the same property. And so on. The "mistakes" have been many.

Beyond the title problem is the fundamental issue of the integrity of the court system. When attorneys file false documents, it's called a fraud on the court for a reason: Courts can't function when lawyers do that.

### The Bright Light of Bankruptcies

According to attorneys who assist clients facing foreclosure, bad documents have been turning up for years. So why is the practice only coming to light now? Because most people facing foreclosure don't have attorneys to check the documents. Most don't even contest the foreclosure.

Bankruptcy court is where most of the fraud comes out because in bankruptcy, to prove the bank is owed money and that its claim is "secured" -- meaning it should get paid first -- a bank has to prove it has the right to foreclose. It has to produce the necessary documents. Indeed, the reason that the banks are halting foreclosures in only 23 states is that in those states, judges are involved in the foreclosure process, meaning somebody might actually start looking at the documents.

Not all debtors in bankruptcy have attorneys, and not all those attorneys know what to look for. But enough attorneys have caught on to the bank's practices that robo-signer fraud is finally getting exposure on the same scale as it's being committed.

### Caveats All Around

Title companies take note: It's increasingly obvious that GMAC's foreclosure problems are the tip of the iceberg. The title you insured on the resale of any foreclosed property -- particularly on mortgages that were included in securitizations -- might be clouded. Better double-check those documents.

Purchasers of foreclosed properties: I hope you bought title insurance. And you might want to get your lawyer to look at the foreclosure file.

Homeowners facing foreclosure: Make sure you or your attorney

# EXHIBIT I

scrutinizes bank documents carefully because if anything is amiss, you may be able to get a meaningful modification of your mortgage instead of losing your home.

Banks submitting these documents: You could face big sanctions if courts notice you make the same kind of bad filings over and over.

Attorneys submitting these documents: If state bar associations start paying attention, you could risk your professional license on the robo-signed dotted line.

# EXHIBIT I

**315 S Ashland**                                       Full Mt Beg        Full Mt End

| | | | | | | |
|---|---|---|---|---|---|---|
| $ | 603,913.7700 | Principal | | | | |
| $ | 95,015.7665 | Interest | 7.3750% | **01/01/11** | | **01/01/13** |
| $ | 38,650.4813 | Def Int on Principal | 3.0000% | 01/01/11 | | 01/01/13 |
| $ | 7,062.2500 | Late Charge | 5.0000% $ | 5,649.70 | $ | 282.49 |
| $ | 55,050.9900 | Tax Escrow | | | | |
| $ | 9,173.7821 | Def Int on Neg Tax Escrow | 10.3750% | | | |
| $ | 8,106.1600 | Insurance Escrow | | | | |
| $ | - | Def Int on Neg Ins Escrow | | | | |
| $ | 121.0000 | UCC Renewal Fee | | | | |
| $ | 500.0000 | KeyBank Processing Fee | | | | |
| $ | 817,594.1998 | **ACCELERATED AMOUNT** | | | | |
| $ | - | plus Legal Costs | | | | |
| $ | 817,594.1998 | **NET ACCELERATED AMOUNT DUE** | | | | |
| | | | | | | |
| $ | 47,824.2634 | Total Default Interest (on principal and hrg tax escrow) | | | | |
| $ | 142,840.0298 | Total Interest | | | | |

Per Diem

| | | |
|---|---|---|
| $ | 123.718 | Regular Interest |
| $ | 50.326 | Default Interest on Principal |
| $ | 174.045 | **Per Diem on Principal** |
| $ | 15.865 | Tax Escrow Default Int |
| $ | - | Insurance Escrow Default Int |
| $ | 189.910 | **TOTAL Per Diem** |

| | | |
|---|---|---|
| $ | 213,680.43 | **Cure Amount** |

# EXHIBIT J

```
                    Transaction Receipt
FA Financial Center          Card Number    Oct 31,08
003 (00258)Little Italy                     05:16PM
Transaction        Amount    Description
You Paid          $7,150.20  To REAL ESTATE:Payment
                                7215382153541257
                                ref 105-01


            Thank you for banking with Citibank.  citibank
```

EXHIBIT K

Case: 1:13-cv-02745 Document #: 49-0 Filed: 11/12/15 Page 60 of 66 PageID #:508

CITIBANK, N.A. - COMMERCIAL REAL ESTATE
ACCOUNT SERVICE SUMMARY
FOR 10/01/08 TO 12/28/10

1/28/10 Thursday
8:07 A.M.

LOAN ID:
BORROWER
ORIG LOAN: 713300.00
CUR. EXT INT RPL
REDACTED
HWY TRX
BEG 12/96
CUR. BAL
(0)
20 E JACKSON 10TH FL
TERM 15 YRS 00 MOS.
CURL BALANCE
DATE INT RPL
.000000
END 1/24
INTEREST
UPDT INT RATE & NATURE
.000100
DUAL RATE:
.03000
NEXT PRINCIPAL DUE DATE
9/01/2008

EXHIBIT L

| | |
|---|---|
| 1 | STATE OF ILLINOIS ) |
| | ) SS. |
| 2 | COUNTY OF C O O K ) |

3     IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
          COUNTY DEPARTMENT, CHANCERY DIVISION

4

5  WELLS FARGO BANK, N.A.,       )
                          )

6            Plaintiff,    )
                          )

7       vs.            )  No. 09 CH 1149
                          )

8  MAY TOY, MARQUETTE NATIONAL  )
  BANK AS TRUSTEE UNDER A TRUST  )
  AGREEMENT DATED DECEMBER 2,   )

9  1998 AND KNOWN AS TRUST NUMBER )
  14662, UNKNOWN OWNERS AND    )

10  NONRECORD COMPLAINTS,      )
                          )

11          Defendants.   )

COPY

12

13        **REPORT OF PROCEEDINGS** had at the trial

14 of the above-entitled matter, before the HONORABLE

15 ROBERT E. SENECHALLE, JR., Judge of said Court, on

16 the 28th day of January, 2013, at 9:30 o'clock A.M.

17 **APPEARANCES:**

18         JOHNSON BLUMBERG & ASSOCIATES LLC
        BY:  MS. REBECCA REYES

19             MR. NOAH WEININGER
        230 West Monroe Street

20         Suite 1125
        Chicago, Illinois  60606

21         (312) 541-9710

22         Appeared on behalf of the Plaintiff;

23

        MS. MAY TOY, pro se.

24

EXHIBIT M -page 1

1  system if a borrower made a payment, which Ms. Toy

2  did I think pretty frequently made the payment at

3  the branch, if she made the payment at the

4  branch -- if a payment was made at the branch on

5  the last day, the system would assess the late

6  charge anyway because it's doing it by the system.

7                      But when the effective day of the

8  payment, which is the last column on that history

9  is the effective date, you can see although the

10 payment is posted on -- you know, for example, the

11 first payment that is posted is the 28th of

12 October, but it's effective October 22nd, that

13 means that it was in the branch and the effective

14 date -- so we're giving credit for the actual date

15 received. And as such then the loan -- the system

16 would then automatically waive if it was within the

17 grace period.

18     Q.   And that would happen automatically?

19     A.   Automatically.

20     Q.   How is that reflected on the transaction

21 history?  What does it say?  What does the

22 transaction history say when a late charge is

23 charged?

24          A.   Well, for example, if you look at on the

EXHIBIT M -page 2

1    STATE OF ILLINOIS )
                     ) SS.
2    COUNTY OF C O O K )

3      IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
           COUNTY DEPARTMENT, CHANCERY DIVISION

4

WELLS FARGO BANK, N.A.,    )
5                           ) Before Judge Robert
             Plaintiff,    ) E. Senechalle, Jr.
6                           )
      vs.                  ) No. 09 CH 1149
7                           )
    MAY TOY, et al.,        ) January 28, 2013
8                           ) 12:45 o'clock P.M.
             Defendants.   )
9

COPY

10

11      COURT CONVENED PURSUANT TO ADJOURNMENT

12

13

14    PRESENT:

15        Ms. Rebecca Reyes,
        Mr. Noah Weininger,
16        Ms. May Toy.

17             -    -    -    -

18

19

20

21

22

23

24

# EXHIBIT N

1

INDEX

2

3 | WITNESS | EXAMINATION BY | PAGE

4 Ms. Flower    Cross:  Ms. Toy              96

5              Redirect:  Ms. Reyes         186

6              Recross:  Ms. Toy            189

7

8 Ms. McGaughey   Direct:  Mr. Weininger    191

9              Cross:  Ms. Toy             216

10             Redirect:  Mr. Weininger    222

11             Recross:  Ms. Toy           223

12

13          E X H I B I T S          ADM IN EVD

14 Exhibit C                              106

15 Exhibit N                              113

16 Exhibits B-2 through B-8               129

17 Exhibit B-10                           159

18 Exhibit B-1                            174

19 Exhibit P                              178

20 Exhibits 5 and 6                       189

21

22

23

24

1    mathematical equation times the number -- the

2    amount of time that is in that period essentially?

3        A.    Correct.

4        Q.    You did do that calculation?

5        A.    Correct.

6        Q.    But you just can't remember the exact

7    amount?

8        A.    I just don't remember it down to the

9    penny.  I can --

10       Q.    Is there something that would refresh your

11   recollection?

12       A.    I -- We --  I have a calculation that is

13   maintained internally.

14       Q.    And is this --  If I can show you the

15   calculation that you did to create this number --

16       A.    Yes.

17       THE COURT:  To create what number?

18       MR. WEININGER:  The number that which she has

19   testified to the calculation that she came up with

20   that she can't remember the exact number.

21                      If I can show this to Ms. Toy,

22   this is --

23       MS. TOY:  Can I get a copy?

24       MR. WEININGER:  I could certainly get you a

1   copy. This is not something I'm going to introduce

2   as evidence. It is just --

3       THE COURT: If you show it to a witness, it is

4   something that you should tender; particularly

5   based on your standards.

6       MS. REYES: That's Ms. -- These are the

7   witness' notes so I don't --

8       THE COURT: Anything you are going to show the

9   witness to refresh her recollection --

10      MS. REYES: I can leave Ms. Toy with that copy

11  as soon as the witness looks at it.

12      THE COURT: Okay.

13      MS. TOY: I think I'd have to object. You

14  know, basically counsel is leading the witness in

15  terms of trying to determine something.

16      THE COURT: Well, okay, but the only issue now

17  is she has testified that she did an interest

18  calculation as to how much interest has accrued on

19  this loan since her company took over the servicing

20  in December 2010 and today; and that it is written

21  down on a piece of paper that she can't remember.

22              So I'm going to let her look at

23  whatever piece of paper contains her calculation.

24  You can certainly ask her about how she got to that

1   going to do it through cross.

2       THE COURT: Okay. Well, I'll reserve ruling on

3   the offer of this exhibit into evidence then. Just

4   be sure you renew your request --

5       MR. WEININGER: Sure.

6       THE COURT: -- at that moment when Ms. Toy is

7   done.

8       MS. REYES: If I can just withdraw the document

9   and I can tender it to Ms. Toy if she would like to

10   keep it.

11             I have no further questions.

12       THE COURT: Ms. Toy, you can cross

13   Ms. McGaughey if you'd like.

14       MS. TOY: Your Honor, I move to strike this

15   witness' testimony due to the fact that for the

16   summary -- for motion for summary judgment that was

17   filed by plaintiff's attorney I raised the

18   objection at the time that Hudson Advisors were not

19   included as a party to this. Only Wells Fargo was

20   ever part of this lender. Hudson Advisors were

21   never included in any of the filings. There was no

22   recording that specified that Hudson recorders is

23   the servicer of it; and even though we moved to

24   evidentiary hearing, plaintiff did not provide any

1 records from Wells Fargo that specifies that there

2 was an agreement saying that Hudson Advisors has an

3 attorney in fact power of attorney for Wells Fargo

4 for this loan.

5 When the court approved

6 substitution of the plaintiff as loan lender, it

7 was strictly from LSREF Nova to Wells Fargo. There

8 was no mention at that time for Hudson Advisors.

9 The only time that this was ever brought up was

10 during their initial motion filed for summary

11 judgment.

12 I raised an objection at that

13 time saying there was no record. There was nothing

14 recorded with the Recorder of Deeds. There was

15 nothing entered into evidence stating that this

16 witness is in fact a -- has power of attorney for

17 Wells Fargo.

18 Key Bank also; there has been no

19 documentation provided that Key Bank is a servicer

20 of this loan prior to the original motion for

21 summary judgment. There has been no foundation to

22 lay that this witness has standing to testify to

23 these records at this point; and Hudson Advisors,

24 you know, is not named as part of this loan.

1          When Ms. -- I'm sorry, how do

2    you pronounce your name?

3         THE WITNESS: McGaughey.

4         MS. TOY: McGaughey testified she was an

5    officer of the first assignee which is LSREF2 Nova

6    and that she was assistant vice president of that

7    company, and that once through acquisition in

8    December of, I think it was -- whatever date it

9    was. A couple --

10        THE COURT: I don't need you to repeat all of

11   her testimony.

12        MS. TOY: Okay. So basically while she was an

13   officer of LSREF Nova she is not an officer of

14   Wells Fargo. There is no power of attorney for or

15   Wells Fargo on the record or introduced in the

16   exhibit.

17               Likewise Key Bank -- The witness

18   testified that Key Bank is the servicer for this

19   loan. The witness is not an employee of Key Bank.

20   I've never heard of Key Bank prior to these records

21   being introduced into evidence. And it is I think,

22   you know, that the plaintiff's attorney needs to

23   show that the witness is actually qualified, not

24   through her testimony stating that she is a --

1     THE COURT:  I think I understand your

2  objection.  I have a question for the plaintiff's

3  counsel.  Well, I have a question for the witness.

4                 These last two pages to

5  Exhibit 5, the loan history that you referred to,

6  whose records are these?

7     THE WITNESS:  I'm not sure I understand your

8  question, but these are maintained by Key Bank as

9  part of the servicing contract.

10     THE COURT:  Okay.  So -- And the employees of

11  Key Bank would input this information that is on

12  this two-page record?

13     THE WITNESS:  Yes, sir.

14     THE COURT:  You are not -- And you are not

15  involved in the preparation of this document?

16     THE WITNESS:  Not of Key Bank.  It is --

17     THE COURT:  Okay.  Or in the input of this

18  information into their computer system?

19     THE WITNESS:  Not into Key Bank's, no.

20     THE COURT:  So how does this document come in?

21     MR. WEININGER:  Your Honor, she testified that

22  they integrate this record into their records; that

23  they maintain these records, that they -- in their

24  capacity as special servicer that they track the

1   servicing of the loan and the disbursements and the

2   collection of payments. That they are involved in

3   that on a day-to-day basis.

4       THE COURT: That is not what she said. She

5   said that they are not involved in the collection

6   of payments, and Key Bank does that for them.

7   These are Key Bank's records for whom she does not

8   work. So how is she able to lay a business record

9   foundation for a document prepared by a company

10  that she doesn't work for?

11      MR. WEININGER: Because she indicated that

12  these records are maintained by her company. That

13  they are --

14      THE COURT: No, she didn't testify that these

15  records are maintained by her company.

16      MR. WEININGER: I believe that she did.

17      THE COURT: Right?

18      THE WITNESS: My company has entered into a

19  contract whereby Key Bank has been hired to

20  maintain these records for us as servicer.

21      THE COURT: All right.

22      THE WITNESS: And we rely on these records from

23  Key Bank.

24      THE COURT: I understand. The court finds that

1    there has not been a foundation laid for the

2    admission of these two records by this witness and

3    so these two pages will not be admitted.

4                    And to the extent that this

5    witness' testimony is dependent upon information

6    that is on this loan history report that is

7    prepared by another company, that testimony would

8    also be stricken.  So --

9        MR. WEININGER:  Your Honor, she testified

10   that -- I mean that she had knowledge personally

11   from her company that they made certain

12   disbursements that are on that sheet.  That they

13   make -- that they actually pay the money, for

14   example, for the taxes.  She did testify to that.

15       THE COURT:  Well, she testified that --

16       MR. WEININGER:  That the lender --

17       THE COURT:  Hold on a second.  She testified

18   that Key Bank makes the payments.

19       MR. WEININGER:  But that --

20       THE WITNESS:  And then charges us as servicing

21   expenses pursuant to the contract we have with Key

22   Bank.

23       THE COURT:  Okay.  And that information that --

24   that information that you have as to what money was

1  paid by Wells Fargo Bank to Key Bank comes from

2  where?  You probably have records to that, but it

3  is not this.  I mean this is --  I mean you have

4  some internal records that wherein you are charged

5  and then Wells Fargo reimburses Key Bank, right?

6      THE WITNESS:  Correct.

7      THE COURT:  You see the problem you have with

8  this document is that these are records that are

9  prepared in the regular course of business by Key

10  Bank.  If payments were made on the loan, they

11  would go to Key Bank and Key Bank -- some employee

12  at Key Bank inputs all this information and they

13  keep track of it.  So it is their business records,

14  their software, their employees that create this

15  document.

16                      I understand that the witness

17  says that they rely on it; but just because they

18  rely on it, doesn't mean that it is a --

19      MR. WEININGER:  Your Honor, she did -- she

20  testified that there were other matters that --

21  Everything that she testified to was also based on

22  her knowledge of their day-to-day monitoring of the

23  loan.  I would just like to point that out.  I

24  think her testimony was not based on this document.

1   Some of the information came from this document,

2   but her testimony about the balances and the

3   interest was all based on the loan documents and

4   her own calculations.

5        THE COURT:  Yeah, but --  Right.  I think she

6   can do the interest calculation.  I don't have a

7   problem with that.  But in terms of whether

8   payments were made and what tax payments were made

9   and so forth, that really all comes from the

10  records of Key Bank.  And in order for her to

11  testify as to what is in these records, these

12  records have to come in.

13                  So I don't think a foundation has

14  been laid as of yet for the admission of these

15  documents.

16                  Are there any other questions you

17  want to ask this witness?

18       MS. TOY:  So is her testimony stricken?

19       THE COURT:  No, I'm not striking her testimony;

20  but I'm not admitting the exhibit and I'm striking

21  whatever testimony that she has given with regard

22  to -- specifically with regard to $55,000 being

23  paid in taxes and $7300 being paid in insurance all

24  of which came from this particular document which

1   is not in evidence. I think that those are the

2   things that she testified to that came from this

3   record. So those -- so those will be stricken.

4             Her interest calculation which

5   she has made from her knowledge of the principal

6   loan which is already in evidence from the other

7   witness is a mathematical calculation that she says

8   that she has made and you can cross examine her

9   about that as to whether it is right or not. But

10   that testimony will stand.

11       MS. TOY: Okay.

12       THE COURT: Go ahead.

13       MS. TOY: How about my motion to strike her

14   testimony because there is no record on file and no

15   documentation on file that she actually has power

16   of attorney for Wells Fargo?

17       THE COURT: That motion is denied.

18       MS. TOY: Okay.

19

20             CROSS EXAMINATION

21              By Ms. Toy:

22       Q. So you testified that you are the power of

23   attorney for Wells Fargo?

24       A. I am assistant vice president of Hudson